IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 129,260

In the Matter of DAVID L. MILLER,
*Respondent.*

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held January 29, 2026. Opinion filed July 2, 2026. Published censure.

*Matthew J. Vogelsberg,* Chief Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was with him on the briefs for the petitioner.

*David M. Rapp,* of Hinkle Law Firm LLC, of Wichita, argued the cause and was on the brief for respondent, and *David L. Miller,* respondent, argued the cause pro se.

PER CURIAM: This is an original action in attorney discipline against David L. Miller, of Wichita, who was admitted to practice law in Kansas in October 2016. Miller's predicament arises from his representation of two clients, G.M. and D.S., one of whom (G.M.) was a confidential informant (C.I.) who was suspected of having conducted a controlled buy with the other (D.S.), whom Miller was representing on criminal drug charges arising from the buy.

On November 21, 2024, Matthew J. Vogelsberg, Chief Deputy Disciplinary Administrator, filed a formal complaint and notice of hearing against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC), specifically KRPC 1.6 (2024 Kan. S. Ct. R. at 333) (confidentiality); 1.7(a) (2024 Kan. S. Ct. R. at 339) (conflict of interest); and 8.4(c) (2024 Kan. S. Ct. R. at 430) (misconduct involving fraud, deceit, misrepresentation, or dishonesty).

1

On December 12, 2024, the respondent, through counsel David M. Rapp, filed an answer to the formal complaint.

The hearing panel held a two-day hearing, recessed to review additional briefing submitted by the parties, and heard closing arguments on a third day. Ultimately, Miller stipulated to violating KRPC 1.6 but contested the other alleged violations.

Upon consideration of the stipulations of the parties and the evidence and argument presented at the hearing, the panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report.

The panel unanimously found that, although Miller had violated KRPC 1.6, there was not clear and convincing evidence sufficient to find a violation of KRPC 1.7(a) or 8.4(c). The panel concluded that Miller's violation of KRPC 1.6 was committed with a "negligent" state of mind and that he exhibited remorse. The panel recommended published censure per Kansas Supreme Court Rule 225(a)(5) (2025 Kan. S. Ct. R. at 274).

Before we set forth the relevant portions of the panel's report, we note that the Office of the Disciplinary Administrator (ODA) has taken exceptions to certain of the findings, conclusions, and recommended discipline. Specifically, ODA challenges the following determinations of the panel: (1) that respondent's representation of D.S. and G.M. did not conflict in violation of KRPC 1.7(a)(2); (2) that respondent did not engage in dishonest conduct by falsely denying to G.M. that he had disclosed any information to D.S. about G.M. potentially being a confidential informant in violation of KRPC 8.4(c); (3) that respondent showed remorse; (4) that respondent's mental state was negligent; and (5) the recommendation of published censure.

As evidenced by the position of our dissenting colleagues, this presents a closer case than some. Ultimately, we agree with the ODA regarding Miller's mental state. But a majority of the court, constrained by our standard of review, concludes that the hearing panel's findings were supported by clear and convincing evidence; any contrary conclusion would require reweighing the evidence or revisiting the credibility of witnesses, which we do not do. Crediting the panel's findings on disputed facts, we agree with the legal conclusion that there was no violation of KRPC 1.7(a) or 8.4(c), and that published censure is an appropriate discipline.

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant portions of the hearing panel's findings of fact and conclusions of law follow.

"*Findings of Fact*

"27.     The hearing panel finds the following facts, by clear and convincing evidence:

"DA 13,983

"28.     D.S. retained respondent to represent him in a criminal case in Sedgwick County in January 2022. D.S. was charged with distribution of marijuana, acquiring proceeds from the sale of drugs, and two counts of criminal possession of a firearm by a convicted felon.

"29.     The charges were based on evidence in D.S.'s home obtained pursuant to a search warrant executed on December 2, 2020.

"30.     In the application for the search warrant, [Officer Jared M.] Henry stated he had probable cause to believe illicit items were in D.S.'s home based on information obtained from a confidential informant (C.I.), who said D.S. was selling marijuana from his residence and illegally possessed firearms. Henry said that within 72 hours of applying for the search warrant police observed the C.I., who conducted a controlled buy of marijuana from D.S. The identity of the C.I. was not revealed in the application.

"31.     Approximately one year later, around January 16, 2023, G.M. consulted with respondent. G.M. was concerned about potential criminal charges, but he had not yet been charged.

"32.     G.M. had been working as a C.I. for Henry; he was concerned that activities he had participated in under the auspices of being a C.I. could lead to criminal charges against him.

"33.     During the consultation G.M. told respondent he had worked as a C.I. for the Wichita Police Department and identified D.S. as a person he had purchased drugs from during a controlled buy.

"34.     Respondent was concerned when he heard G.M. mention D.S.'s name. Respondent was concerned that if G.M. was the confidential informant referred to in the application for a search warrant in D.S.'s case, it would create a conflict of interest in representing both people.

"35.     Despite these concerns, respondent had G.M. sign an engagement letter and accepted an initial retainer of $5,000 on January 16, 2023.

"36.     G.M. and respondent had a second meeting on January 23, 2023, along with Britt Pate, a private investigator who respondent regularly engaged. Respondent accepted an additional $1,500 from G.M. on January 23, 2023, to retain Pate.

"37.    Respondent was not sure if the controlled buy described by G.M. was the same controlled buy that formed the basis for the search warrant that led to D.S.'s arrest, because the details of the controlled buy described by G.M. were different than described in the application for the warrant.

"38.    Following the discussion with G.M., respondent spoke to D.S. to clarify details of the controlled buy. Respondent admits that during that discussion he mentioned G.M.'s name to D.S.

"39.    Respondent testified at the formal hearing regarding this:

'And then I spoke with [D.S.] and was trying to get his memory of what occurred during that buy as well. And during the course of that, I—yes, I did say did you ever—do you ever purchase from [G.M.]? And he said yes. But he said I don't know if [G.M.] was the C.I. in this particular buy that I was representing him on.'

"40.    Respondent also reported that '[D.S.] told me that he had always suspected that [G.M.] was the C.I. but was not for sure because he did not believe he made any sale to [G.M.] in November of 2020.'

"41.    Respondent filed a motion for discovery in D.S.'s case on January 25, 2023. The basis for the motion was discovery of the date of the purported controlled buy that formed the basis for the probable cause in that matter. Respondent specifically said '[t]he Defendant does not seek any information that would intentionally or inadvertently disclose the identity of the confidential informant that was purportedly used to conduct this controlled buy.' Respondent alleged a good faith belief that the controlled buy did not take place within 72 hours of the affidavit, as alleged in the affidavit.

"42.    Respondent simultaneously filed a motion to suppress, and cited this same good faith belief as one of the bases for suppression.

"43.    Respondent corresponded with assistant district attorney Natasha Esau regarding the motions. Ultimately Esau confirmed that the controlled buy had occurred within 72 hours of the affidavit. Based on this, and the differences in the details of the

5

controlled buy described by D.S. and G.M., respondent concluded that the two were describing different events and that there was no conflict of interest in representing both G.M. and D.S. Respondent and D.S. opted against pursuing the motions after reaching this conclusion.

"44.    D.S. entered into a plea agreement on February 3, 2023.

"45.    G.M. testified at the formal hearing that he had been on good terms with D.S. before he met with respondent. However, approximately one week after the January 23, 2023 meeting with respondent, G.M. became aware that D.S. had blocked him on various social media platforms.

"46.    In his complaint to the disciplinary administrator, and again in his testimony, G.M. reported that he believed D.S. was telling people that G.M. was a confidential informant, both on social media posts and in person.

"47.    As a result of G.M.'s belief that D.S. was telling people that G.M. was working with police, G.M. called respondent and expressed his concerns:

'I told Mr. Miller that [D.S.] was going around telling people that he had a meeting with his lawyer, and his lawyer told him that I'm a C.I. Not a rat, not this normal street knowledgey, [*sic*] street terms. C.I.'

"48.    Respondent told G.M. that he would contact D.S. to find out if D.S. had been saying those things. Respondent later called G.M. and reported that D.S. denied saying those things.

"49.    Around February 20, 2023, G.M. met with respondent in person at respondent's office. G.M. again questioned respondent as to what information he had told D.S. G.M. surreptitiously recorded the conversation with his phone, without respondent's knowledge.

"50.    In the recorded conversation respondent denied that he had told D.S. that G.M. was a confidential informant. Respondent acknowledged that he had spoken with

D.S. following the phone call in which G.M. expressed his concerns and that D.S. denied making statements about a confidential informant.

"51.    For his part, respondent testified at the formal hearing that following the meeting with G.M., respondent spoke with D.S. for more details regarding the controlled buy that led to his arrest. Respondent asked D.S. if he remembered selling drugs to G.M. D.S. told respondent that he always wondered if G.M. was a confidential informant. Respondent testified that he was trying to determine whether he had a conflict of interest, but because the details of the controlled buy described by G.M. and D.S. were different than the details of the controlled buy referred to in the arrest affidavit, he determined that they were different controlled buys and that he did not have a conflict of interest.

"52.    During the secretly recorded meeting with respondent, G.M. expressed his belief that respondent had filed motions in D.S.'s case seeking to disclose the identity of the C.I. in D.S.'s case.

"53.    Respondent told G.M. that he had filed a motion to suppress on the basis of lack of probable ca[u]se, and that he had intended to file the affidavit before meeting with G.M.

"54.    G.M. filed a disciplinary complaint with the Office of the Disciplinary Administrator on March 2, 2023, alleging that respondent had revealed his identity as a confidential informant to D.S.

"55.    After receiving the complaint respondent terminated his representation of G.M. and refunded him the $6,500 that G.M. had advanced him.

"56.    G.M. testified that he has experienced threats and has lived in fear since it became known that he was cooperating with police; he also testified that there have been threats against his girlfriend and daughter, and he testified that he has found bullet holes in his car.

"57.    Henry testified in general terms to the importance of keeping the identities of confidential informants from being public. Henry testified that being a

7

confidential informant is inherently risky and that confidential informants are at risk of retaliation if discovered.

"58.    Esau testified that the district attorney's office usually does not charge defendants for the controlled buy because doing so could reveal the identity of the confidential informant and put them in danger.

"*Conclusions of Law*

"59.    Based upon the findings of fact, the hearing panel concludes as a matter of law that respondent violated KRPC 1.6(a) (confidentiality of information).

"60.    The hearing panel does not find that clear and convincing evidence supports a violation of KRPC 1.7 (conflict of interest:  current clients). Although the panel recognizes the potentially problematic nature of the situation, the panel does not find clear and convincing evidence established that representation of both clients was directly adverse, nor that the evidence established a substantial risk that representation of one client was materially limited by responsibilities to another client.

"61.    The hearing panel does not find that clear and convincing evidence supports a violation of KRPC 8.4(c) (engaging in conduct involving dishonesty).

"KRPC 1.6(a)

"62.    'A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).' (2023 Kan. S. Ct. R. at 336).

"63.    Respondent concedes he violated this rule by disclosing G.M.'s identity as a confidential informant to D.S.:

"a. In his response to the initial complaint, respondent said 'I do admit I informed [D.S.] that I was filing a motion to suppress in his case; however, I was clear that

8

I was not seeking the identity of the confidential informant because that could put me in a position of a conflict of interest based upon the possibility [G.M.] was the C.I. [D.S.] told me that he had always suspected [G.M.] was the C.I. but was not for sure.'

"b. In his response respondent also said 'I recognize and own my mistake in unthinkingly divulging to [D.S.] the possibility that [G.M.] could have been the C.I. in his case.'

"c. In his response to the formal complaint respondent again admitted to the violation: 'Respondent has acknowledged from the beginning of the complaint process that he inadvertently disclosed G.M.'s name to D.S. during his conversation with D.S. relating to a possible conflict if G.M. was the C.I. in D.S.'s pending case.'

"d. In paragraph 20 of the Formal Complaint, the disciplinary administrator alleged that during a meeting with D.S., 'respondent "brought up" G.M.'s name, and D.S. said that he always thought G.M. was the confidential informant.' In his answer, respondent said: 'Admitted. In further response to this allegation, Respondent emphasizes the importance of the context in which G.M.'s name was brought up. Respondent was seeking confirmation from D.S. that G.M. was not the C.I. because Respondent wanted to avoid a conflict of interest.'

"e. In response to the rule violations alleged by the disciplinary administrator, respondent again admitted the violation of KRPC 1.6(a): 'Respondent has and does admit that he unthinkingly divulged to D.S. the possibility that G.M. was the C.I. in the course of trying to determine the existence of or absence of a conflict of interest.'

"f. In a letter to the panel submitted following the conclusion of evidence but before the closing arguments, Respondent conceded that he violated KRPC 1.6.

"64.     The hearing panel concludes there is clear and convincing evidence that respondent violated KRPC 1.6 by mentioning G.M.'s name to D.S. in the context of controlled buys.

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"65.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"66.     *Duty Violated*. Respondent violated his duty to G.M. to maintain his confidentiality.

"67.     *Mental State*. Respondent violated his duty to G.M. negligently. The panel finds respondent's testimony credible—respondent was attempting to determine whether he had a conflict of interest and went about it poorly, but did not intentionally disclose G.M.'s identity as a confidential informant. This is supported by the substance of the motions respondent filed in D.S.'s case and his emails with the prosecutor. Respondent made it clear he was not seeking to uncover the identity of the confidential informant but was seeking to determine whether the controlled buy described in the arrest affidavit took place when the affidavit said it did.

"68.     *Injury*. Respondent's actions caused injury to G.M. G.M. testified that he and his family had received threats of violence due to G.M. acting as a confidential informant; the hearing panel finds G.M.'s testimony credible on this point.

"Aggravating and Mitigating Factors

"69.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. Rule 226(a)(1)(C)(i) (2025

10

Kan. S. Ct. R. at 275). In reaching its recommendation for discipline, the hearing panel considered the aggravating factors described in Standard 9.22 and found the following aggravating factors:

"70.    *Vulnerability of victim*. Because of his status as a confidential informant and the danger posed to confidential informants if they are discovered, the panel finds that G.M. was uniquely vulnerable to respondent's violation of the duty of confidentiality.

"71    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel found the following mitigating circumstances present:

"72.    *Absence of a prior disciplinary record*. Respondent has not been disciplined before. The disciplinary administrator concedes to the absence of a prior record as a mitigating factor and the panel finds this factor is present.

"73.    *Cooperation with the disciplinary process*. Respondent has cooperated with the disciplinary investigation and with the disciplinary process. Respondent has acknowledged the wrongful nature of his conduct with respect to KRPC 1.6. The panel finds that this is a mitigating factor.

"74.    *Character and reputation*. Respondent submitted 67 letters of support from friends, acquaintances, other attorneys, former clients, and others attesting to his character, reputation, and skill as an attorney. The hearing panel finds this is a mitigating factor.

"75.    *Remorse*. Respondent acknowledged the wrongful nature of his conduct and expressed remorse during the formal hearing. The hearing panel finds this is a mitigating factor.

"76.    In addition to the above-cited factors in Standard 3, the hearing panel has thoroughly examined and considered the following Standards for each violation:

11

'4.2     Failure to preserve the client's confidences.'

'4.22    Suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.'

'4.23    Reprimand is generally appropriate when a lawyer negligently reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed and this disclosure causes injury or potential injury to a client.'

'4.24    Admonition is generally appropriate when a lawyer negligently reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed and this disclosure causes little or no actual or potential injury to a client.'

"*Recommendation of the Parties*

"77.    The disciplinary administrator recommended suspension of respondent's license to practice law for a period of 90 days to one year, per Rule 225(a)(3) (2025 Kan. S. Ct. R. at 274). The disciplinary administrator did not recommend that a reinstatement hearing be required following the suspension for a definite period of time, per Rule 232(a)(1), (d)(1) (2025 Kan. S. Ct. R. at 286).

"78.    Respondent recommended informal admonition per Rule 225(a)(6) (2025 Kan. S. Ct. R. at 274).

"*Recommendation of the Hearing Panel*

"79.    Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends published censure by the Supreme Court, per Rule 225(a)(5) (2025 Kan. S. Ct. R. at 274).

"80.    Costs are assessed against respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

This court hears disciplinary matters when, after a disciplinary hearing, a hearing panel recommends discipline other than informal admonition in a final hearing report. *In re Davis*, 318 Kan. 199, 228, 542 P.3d 339 (2024) (citing Supreme Court Rule 226[b] [2023 Kan. S. Ct. R. at 282]). The ODA and respondent may file exceptions—that is, formal objections—to the report's findings of fact or conclusions of law. Kansas Supreme Court Rule 201(h) (2026 Kan. S. Ct. R. at 251). When an exception is filed, the findings are not deemed admitted and this court "must determine whether attorney misconduct has been established by clear and convincing evidence before deciding the appropriate discipline." *Davis*, 318 Kan. at 229. "'Clear and convincing evidence is "evidence that causes the factfinder to believe that 'the truth of the facts asserted is highly probable.'"' *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009)." *Davis*, 318 Kan. at 229.

In reviewing the disputed evidence, this court examines the panel's factual findings, without reweighing the evidence or assessing credibility, to determine whether clear and convincing evidence supports the panel's findings. The panel's findings on disputed facts stand unless this court determines they are not supported by clear and convincing evidence. See *In re Morton*, 317 Kan. 724, 740, 538 P.3d 1073 (2023); *In re Hawkins*, 304 Kan. 97, 117-18, 373 P.3d 718 (2016).

In considering the evidence, the court may consider the full record to determine whether additional factual context may support or undermine the panel's factual determinations. E.g., *Morton*, 317 Kan. at 741-42 (noting panel's conclusion that reactivating the website exacerbated earlier violations was belied by changes attorney

13

made to the website in response to ODA's concerns before reactivation); *In re Spradling*, 315 Kan. 553, 509 P.3d 483 (2022) (finding clear and convincing evidence did not support panel's finding of rule violation when lawyer's statement appeared to result from poor phrasing in describing evidence).

This court applies de novo review to the hearing panel's legal conclusions. *In re Valdez*, 321 Kan. 198, 210, 574 P.3d 835 (2025).

With these standards in mind, we consider the findings and conclusions challenged by the ODA, which urges us to conclude that the facts clearly and convincingly support a violation of KRPC 1.7(a) and 8.4(c); that the admitted violation of KRPC 1.6 was committed "knowingly" rather than "negligently"; that "remorse" was improperly included among the mitigating factors considered by the panel; and that the appropriate discipline is suspension.

Ultimately, we agree with the ODA regarding the mental state, but are constrained by our standard of review as to the panel's findings and conclusions on the other two alleged violations: we uphold the panel's findings on disputed facts unless they are not supported by clear and convincing evidence. Here, we cannot conclude that the findings were not supported by clear and convincing evidence without reweighing the evidence or revisiting the credibility of witnesses, which we do not do. Based on the panel's findings, we agree with the legal conclusion that there was no violation of KRPC 1.7(a) or 8.4(c).

1. *We adopt the hearing panel's findings and conclusions related to KRPC 1.7.*

KRPC 1.7(a) generally prohibits representation of a client when the representation involves a concurrent conflict of interest. A concurrent conflict exists when "the representation of one client will be directly adverse to another client" or "there is a substantial risk that the representation of one or more clients will be materially limited by

the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." KRPC 1.7(a) (2026 Kan. S. Ct. R. at 341).

A lawyer may nevertheless represent clients who have concurrent conflicts if they meet the requirements of the rule for doing so, i.e., reasonably believe they can provide competent and diligent representation to each client, no law prohibits the representation, the representation does not involve claims by one client against the other client in the same litigation or proceeding, and each client gives informed consent confirmed in writing. KRPC 1.7(b).

A few comments to KRPC 1.7 are useful in evaluating the arguments and evidence here. Comment 2 provides certain steps the lawyer must take to resolve a potential conflict of interest issue. Those steps include: "1) clearly identify[ing] the client or clients" and "2) determin[ing] whether a conflict of interest exists." KRPC 1.7, Comment [2] (2026 Kan. S. Ct. R. at 341).

Comment 4 requires a lawyer ordinarily to withdraw from the representation after a conflict arises. When multiple clients are involved, the lawyer may continue to represent one in some cases if he or she can comply with duties owed to the former client or clients and continue to adequately represent the remaining client or clients. KRPC 1.7, Comment [4] (2026 Kan. S. Ct. R. at 342).

Both parties also point to comment 6, which prohibits a lawyer from undertaking representation that is directly adverse to an existing client without that client's informed consent. The comment describes the dangers of representing clients whose interests are adverse even in unrelated matters, including feelings of betrayal, damage to the lawyer-client relationship, and impairment of the lawyer's ability to effectively represent one client or the other. The comment notes that "a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit

15

involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit." KRPC 1.7, Comment [6] (2026 Kan. S. Ct. R. at 342).

And comment 8 explains,

"Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests. . . . The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." KRPC 1.7, Comment [8] (2026 Kan. S. Ct. R. at 343).

The hearing panel rejected ODA's claim that clear and convincing evidence showed Miller violated KRPC 1.7. The panel explained,

"Although the panel recognizes the potentially problematic nature of the situation, the panel does not find clear and convincing evidence established that representation of both clients was directly adverse, nor that the evidence established a substantial risk that representation of one client was materially limited by responsibilities to another client."

The ODA argues the hearing panel failed to address its arguments that Miller violated KRPC 1.7 by using confidential information he learned from G.M. (about the timing and circumstances of the buy) in D.S.'s criminal case and that Miller avoided seeking discovery in D.S.'s case that would have revealed G.M. was the confidential informant in D.S.'s case. In response, Miller asserts that the ODA is asking the court to reweigh the evidence. On reply, the ODA asserts that "uncontested facts show that respondent's representation of D.S. was, at the very least, materially limited by his representation of G.M."

16

In the ODA's account, after meeting with G.M., Miller suspected G.M. was the C.I. in D.S.'s case. Although Miller had called the prosecutor much earlier in D.S.'s case in an effort to seek disclosure of the C.I.'s identity, Miller changed his approach after undertaking representation of G.M. Instead, Miller used the information from G.M. about the timing and circumstances of the buy in D.S.'s case to support a motion for discovery and motion to suppress that expressly did *not* seek the identity of the C.I. The ODA posits that Miller did this because he wanted to avoid confirming his suspicion that the C.I. in D.S.'s case was G.M. In other words, Miller changed his defense strategy in order to avoid putting himself in a conflict-of-interest position. According to the ODA, this evidences that Miller's representation of D.S. was, at the very least, materially limited by his representation of G.M.

Although evidence might be interpreted as the ODA suggested, that is not the only interpretation that follows from the facts presented to the panel.

Miller's version of events painted a different picture. Miller knew D.S. wanted to minimize his potential criminal liability but that there was little basis for challenging the charges unless there was a basis for excluding the evidence obtained pursuant to the search warrant. Miller contacted the prosecutor stating his intent to seek discovery of the C.I.'s identity in November of 2022 and told her he had litigated the issue before, not necessarily because he thought he had a strong case for doing so but to "feel out" the prosecutor about the case. The prosecutor recited all the reasons the State does not disclose the identities of its C.I.s or even the date of a controlled buy, which might compromise the C.I.'s identity. About two months after this conversation, G.M. contacted Miller to represent him in anticipation that he may be charged with various offenses based on perceived threats by the officer he had worked with as a C.I. G.M. told Miller he participated in a controlled buy from D.S. G.M. did not remember the exact date of the buy, but thought it was in November—he recalled the weather being warm and sunny, leading Miller to believe it may have been earlier, perhaps summer.

17

Miller recognized the potential for conflict and disclosed the possibility to G.M. Consistent with his obligation under the rule, Miller then contacted D.S. to try to determine whether there was in fact a conflict. During this conversation, Miller asked whether D.S. ever sold drugs to G.M. D.S. told Miller that he did not sell any drugs during November or December of 2020. D.S. also speculated that G.M. was a confidential informant, and that some in the community believed G.M. has been working with a particular police officer. Based on these conversations, and his comparison of the details of the transaction described with the probable cause affidavit, Miller questioned the veracity of the representations in the probable cause affidavit supporting D.S.'s case and saw an alternative—and possibly more effective—basis for challenging the search. Miller sought discovery about the date of the controlled buy since that was the underlying factual representation he questioned.

Being fully aware of the State's inflexible position on disclosing a C.I.'s identity and the caselaw supporting the State's position, Miller knew that he was unlikely to uncover the C.I.'s identity. So he focused his energy on attacking the probable cause affidavit based on his client's memory that he did not sell any drugs during the relevant timeframe.

Although Miller had G.M. sign a representation agreement, there was no active case involving G.M., and Miller was aware of the potential conflict with his current client, D.S., who he was actively defending. As the comments direct, Miller attempted to determine whether an actual conflict existed. Regrettably, he did so by asking D.S. if he had ever done a buy with G.M., which violated KRPC 1.6. Indeed, Miller may have been so focused on discovering whether there was a conflict that, in an effort to make that determination, he knowingly divulged G.M.'s name in a manner that left D.S. to believe that G.M. was a C.I., which resulted in G.M. receiving threats to his life and threats against his family. Based on his inquiry, Miller became convinced that G.M. was not the

18

C.I. in D.S.'s case. And by the time G.M. confronted Miller about the disclosure, Miller's representation of D.S. was over.

One member of the panel asked pointed questions about Miller's conversation with D.S. in which he shared G.M.'s name. On this point and others, the hearing panel found Miller's testimony to be credible, and we do not reweigh that determination.

On this record, we cannot say the panel erred in concluding that the evidence of a KRPC 1.7 violation falls short of the clear and convincing standard.

A violation of KRPC 1.7 requires a concurrent conflict of interest, which exists if either (1) the representation of one client will be directly adverse to another client; or (2) there is a substantial risk that the representation of one or more clients will be materially limited. Although our colleagues disagree, there is no concurrent conflict. KRPC 1.7 (2026 Kan. S. Ct. R. at 341). We can only reach a different conclusion if we reject the panel's credibility determinations and related findings, including that (1) it was highly unlikely the C.I.'s identity would be revealed under any circumstances; (2) Miller never intended to seek the C.I.'s identity or call the C.I. as a witness to challenge the probable cause affidavit; (3) Miller believed G.M. was *not* the C.I., based on D.S.'s representation that he did not sell any drugs in November or December of 2020 and the differences in the accounts between D.S., G.M., and the affidavit; and (4) absent Miller's representation of G.M., Miller would have sought the C.I.'s identity.

ODA's view of the violation rests on its view that, absent the concurrent representation, Miller would have sought the C.I.'s identity. This argument fails to recognize the illegitimacy of that path, about which there was much testimony. ODA's own witness, the prosecutor in D.S.'s case, testified she considered a C.I.'s identity privileged information and that she would not call the C.I. as a witness at trial so as not to have to "burn" the C.I. She also said the C.I.'s identity and credibility would not have

become an issue at trial based on the information she had in front of her about the case. She indicated the possibility of a C.I.'s identity becoming discoverable if the C.I.'s credibility came into question, and that any request for the identity would need to be supported by an affidavit asserting what information was false before an evidentiary hearing might be held to determine whether the identity must be disclosed. She was not aware of a situation in which a C.I.'s identity would be disclosed.

Miller similarly explained how difficult it is to get the identity of a C.I., and that motions requesting this information were usually denied. The prosecutor and Miller's statements are supported in Kansas law, which limits admissibility of confidential informants' identities in many cases and places the burden on the defendant to show the identity is material to his defense. See K.S.A. 60-436; *State v. Washington*, 244 Kan. 652, 772 P.2d 768 (1989). This background makes doubtful whether it would be obviously necessary to seek a C.I.'s identity. Reasonable counsel without a conflict might well choose not to seek discovery of the C.I.'s identity knowing the barriers to doing so.

The ODA may be correct that Miller avoided requesting the C.I.'s identity because he feared a conflict. But it is equally possible that reasonable counsel even with no potential conflict would have chosen not to waste resources trying to get the C.I.'s identity given the legal hurdles to doing so when the only factual challenge they might have to the affidavit—the date of the controlled buy—was arguably only supported by their client's potentially self-serving statement of when they last sold drugs and could be established through other means. The hearing panel, faced with equally plausible paths, credited Miller's account and determined the ODA failed to establish a violation of KRPC 1.7 by clear and convincing evidence, i.e., that the ODA's version was highly probable.

Nothing the ODA argues to this court suggests the panel erred in drawing that conclusion from the facts presented.

The ODA argues Miller's decision to refrain from seeking the C.I.'s identity required D.S.'s informed consent pursuant to KRPC 1.7(b)(4). But informed consent only comes into play if there is a concurrent conflict of interest. KRPC 1.7(b). And the hearing panel concluded clear and convincing evidence did not support finding a concurrent conflict of interest. Since the ODA failed to establish the predicate for the requirement, there is no reason to conclude Miller violated KRPC 1.7(a)(2) based on the failure to obtain informed consent to the strategic decision not to pursue the C.I.'s identity.

2. *We adopt the hearing panel's findings and conclusions related to KRPC 8.4.*

The ODA argues that Miller violated KRPC 8.4(c) by making false representations to G.M. when G.M. confronted Miller about being outed by D.S. as a C.I.—specifically by denying that he had told D.S. that G.M. was a C.I. Again, crediting the hearing panel's factual findings, we affirm the panel's conclusion that the ODA's evidence of a KRPC 8.4(c) violation fell short of the clear and convincing evidence standard.

KRPC 8.4(c) (2026 Kan. S. Ct. R. at 432) defines professional misconduct to include "conduct involving dishonesty, fraud, deceit or misrepresentation." KRPC 1.0(e) (2026 Kan. S. Ct. R. at 323) defines fraud as having "a purpose to deceive" and incorporates by reference the substantive or procedural law of the applicable jurisdiction here in Kansas. The KRPC does not define dishonesty, deceit, or misrepresentation. *In re Buckner*, 308 Kan. 427, 449, 421 P.3d 226 (2018).

KRPC 8.4(c) is identical to the Model Rule of Professional Conduct, and this court has taken guidance from the Model Rule before. *Buckner*, 308 Kan. at 449 (citing American Bar Association: Annotated Model Rules of Professional Conduct [8th ed. 2015] [AMRPC], Rule 8.4[c], Misconduct, p. 669). The Model Rule indicates the prohibition is broad: "'A lawyer may not mislead or lie to a client.'" 308 Kan. at 449 (quoting AMRPC 8.4, p. 680). The Model Rule's annotation distinguishes fraud and

deceit, which require intent to deceive, from misrepresentation, which does not. And dishonesty involves some lack of honesty, probity, or integrity that may not rise to the level of fitting legal definitions of fraud, deceit, or misrepresentation. 308 Kan. at 449 (quoting AMRPC 8.4, pp. 678-79, which includes citations to *In re Obert*, 336 Or. 640, 89 P.3d 1173 [2004]; *In re Scanio*, 919 A.2d 1137 [D.C. 2007]; and *Fla. Bar v. Ross*, 732 So. 2d 1037 [Fla. 1998]).

ODA's argument that Miller violated KRPC 8.4(c) depends on the interpretation of (1) Miller and D.S.'s discussion regarding G.M. and (2) the meeting between Miller and G.M., which G.M. surreptitiously recorded.

In ODA's view, Miller "met with D.S. and discussed with him the possibility of G.M. being the confidential informant in D.S.'s case" and then, when G.M. confronted Miller with claims that D.S. was posting that his attorney told him G.M. was a C.I., Miller "falsely denied telling D.S. *anything* that would indicate . . . that G.M. was an informant."

But the hearing panel's findings of fact and conclusions of law credited Miller's representation that he "was attempting to determine whether he had a conflict of interest and went about it poorly, but did not intentionally disclose G.M.'s identity as a confidential informant":  Miller asked whether D.S. sold drugs to G.M. before, and D.S. then drew the conclusion that G.M. was or might be the C.I. in his case. When confronted by G.M., Miller denied that he had told D.S. that G.M. was a confidential informant. The panel found it consistent that, when "G.M. expressed his belief that respondent had filed motions in D.S.'s case seeking to disclose the identity of the C.I. in D.S.'s case . . . Respondent told G.M. that he had filed a motion to suppress on the basis of lack of probable ca[u]se, and that he had intended to file the affidavit before meeting with G.M." Based on these facts, the panel "[did] not find that clear and convincing evidence supports a violation of KRPC 8.4(c)."

22

ODA's challenge to the panel's conclusion that there was no violation requires us to view the facts as ODA interprets them. But the panel's factual findings, which are supported by the evidence, fall short of establishing a violation. When looking at Miller's statements and conduct in context, and giving deference to the panel's determinations regarding credibility, we cannot say the hearing panel erred in concluding that the evidence fails to constitute conduct or statements rising to the level of "dishonesty, fraud, deceit or misrepresentation" necessary to constitute a KRPC 8.4(c) violation.

3. *We adopt the panel's findings and conclusions as to remorse; we reject the panel's conclusions as to mental state.*

The ODA asks this court to revisit the hearing panel's finding that Miller demonstrated remorse. It disagrees with the panel's conclusion, asserting instead that Miller's testimony that "there's probably things I would do differently now" does not show remorse when contrasted with his testimony that he still believed his actions at the time were reasonable. Miller responds by pointing to his extensive comments about his practice and that he would never knowingly violate the KRPC. He notes he became emotional during this recitation in support of his position, and that this demonstrated his remorse.

A cold record could support either side's position, which is why we defer to the panel's finding that Miller demonstrated remorse: the panel had the opportunity to both hear and see Miller's testimony and demeanor firsthand when making its determination.

The ODA also asks us to revisit the hearing panel's conclusion that Miller violated KRPC 1.6 "negligently." Here, we agree with the ODA: The clear and convincing evidence, as found by the panel, does not support a conclusion that the violation was committed negligently.

23

The state of mind pertains to the violation itself. To violate KRPC 1.6 "negligently" would involve divulging a confidence unintentionally or accidentally, through some conduct that could be considered negligent. The violation admitted here—"mentioning G.M.'s name to D.S. in the context of controlled buys"—was not a slip of the tongue or an unintentional disclosure. Although the violation may have negligently or inadvertently or "unthinkingly" implied that G.M. was a C.I., Miller knowingly divulged G.M.'s name in the context of a controlled buy and in an effort to determine whether a conflict of interest existed. We therefore reject the hearing panel's conclusion about Miller's state of mind related to the admitted violation of KRPC 1.6.

4. *Discipline*

Finally, ODA asks the court to impose suspension of at least 90 days based on its arguments that Miller's conduct constituted multiple rule violations and that his mental state was knowing rather than negligent. We note that it is both rare and significant that a lawyer's rule violation might endanger a client's life. Despite the elevated mental state, however, we have affirmed the panel's findings and conclusion that there is not clear and convincing evidence supporting more than the single, admitted violation of KRPC 1.6. We conclude that a discipline of public censure is warranted.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that David L. Miller is hereby censured in accordance with Supreme Court Rule 225(a)(5) (2026 Kan. S. Ct. R. at 280) for violating KRPC 1.6.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

* * *

STANDRIDGE, J., concurring in part and dissenting in part:  I respectfully dissent from the court's conclusion that the evidence failed to establish a violation of Kansas Rule of Professional Conduct (KRPC) 1.7(a)(2) (2026 Kan. S. Ct. R. Annot. at 341). In my view, the hearing panel's own factual findings—and respondent's repeated admissions—clearly and convincingly establish that respondent's representation of D.S. was materially limited by his responsibilities to G.M.

KRPC 1.7(a)(2) provides that a concurrent conflict of interest exists where "there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." The rule does not require proof that counsel actually abandoned a meritorious defense, nor does it require proof that the conflict ultimately altered the outcome of the representation. The question is whether there existed a substantial risk that counsel's professional judgment on behalf of one client would be materially constrained by duties owed to another.

That standard was satisfied here.

The hearing panel found that respondent simultaneously represented D.S., in a pending felony drug prosecution, and G.M., who disclosed to respondent that he had worked as a confidential informant and had participated in a controlled-buy involving D.S. The panel further found that respondent immediately recognized the possibility of a conflict because, if G.M. were the confidential informant referenced in the search-warrant affidavit in D.S.'s case, respondent could not ethically continue representing both clients. Despite recognizing that possibility, respondent accepted a retainer from G.M., had him execute an engagement agreement, and continued representing D.S. while attempting to

25

determine whether G.M. was the confidential informant in D.S.'s case. Respondent then disclosed G.M.'s name to D.S. in the course of that inquiry.

Most importantly, respondent admitted that he intentionally refrained from seeking information that could reveal the confidential informant's identity because doing so "could put me in a position of a conflict of interest based upon the possibility [G.M.] was the C.I." That admission is dispositive.

A lawyer's decision to avoid pursuing investigative or discovery avenues because doing so might create or confirm a conflict is itself evidence that the lawyer's representation has become materially limited by responsibilities owed to another client. Respondent's own explanation clearly and convincingly demonstrates that his obligations to G.M. affected how he approached D.S.'s defense. Indeed, the hearing panel found that respondent filed motions in D.S.'s case expressly disclaiming any request for information that might reveal the confidential informant's identity.

Whether respondent ultimately believed G.M. was not the confidential informant misses the point. KRPC 1.7(a)(2) addresses substantial risk and material limitation. The conflict arose when respondent recognized that pursuing avenues potentially beneficial to D.S. could expose or endanger G.M., another current client. At that moment, respondent's professional judgment regarding D.S.'s representation became constrained by competing duties.

The majority concludes otherwise largely by deferring to the panel's credibility determinations and by emphasizing the difficulty of obtaining disclosure of a confidential informant's identity under Kansas law. But neither point resolves the KRPC 1.7 issue. First, the analysis in this dissent does not depend upon rejecting the panel's credibility findings. I accept the panel's finding that respondent subjectively believed he was attempting to navigate a difficult situation and that he did not intentionally seek to harm

26

either client. But the material facts are undisputed. Respondent admitted he altered his approach in D.S.'s case because further inquiry into the confidential informant's identity risked placing him in conflict with G.M. Those admissions establish a material limitation regardless of respondent's subjective good faith.

Second, the likelihood that a motion to disclose the confidential informant's identity would succeed is immaterial. Criminal defense lawyers routinely pursue discovery requests, suppression theories, and investigative leads that may ultimately fail. KRPC 1.7(a)(2) is concerned with whether counsel's judgment about pursuing those avenues was constrained by duties owed elsewhere. Here, respondent expressly acknowledged that it was.

Nor does it matter that respondent believed alternative litigation strategies existed. Comment 8 to KRPC 1.7 (2026 Kan. S. Ct. R. at 343) explains that a conflict exists where there is a significant risk that the lawyer's ability to "consider, recommend or carry out an appropriate course of action for the client will be materially limited." A lawyer cannot independently assess all available options for one client while simultaneously avoiding certain strategies because they may harm another current client.

The panel characterized this situation as "potentially problematic." In my view, the rule violation was more than merely potential. Respondent recognized the conflict risk, accepted representation anyway, disclosed confidential information while attempting to investigate the overlap between the two matters, and consciously avoided investigative steps because of responsibilities owed to another client. That conduct falls squarely within KRPC 1.7(a)(2).

I would therefore conclude that the Office of the Disciplinary Administrator established a violation of KRPC 1.7(a)(2) by clear and convincing evidence.

I otherwise concur in the court's disposition regarding the KRPC 1.6 violation and agree that respondent's conduct caused serious actual and potential injury to G.M.

ROSEN, C.J., joins the foregoing concurring and dissenting opinion.